## BACON et al. v. HARRIS et al.

(Circuit Court, N. D. Iowa, W. D.   June 18, 1894.)

1. COURTS—CONFLICTING STATE AND FEDERAL JURISDICTION.

   The appointment by a state court of a receiver of the property of an insolvent bank does not prevent a federal court from entertaining a suit to set aside conveyances to the bank, as void as against the grantor's judgment creditors; nor does the sale by the receiver of the property so conveyed, made after such suit is brought, and the possession by the state court of the proceeds of such sale, defeat the jurisdiction of the federal court over the respective rights of such creditors and the bank, although it may affect the nature and extent of the remedy.

2. FEDERAL COURTS—CREDITOR'S SUIT ON JUDGMENT OF STATE COURT.

   A creditor's suit may be maintained in a federal court, of otherwise competent jurisdiction, on a judgment at law of a state court sitting in the same state and return of execution thereon unsatisfied.

3. ESTOPPEL—CONCEALMENT OF CONVEYANCE BY DEBTOR.

   A creditor who unites with his debtor in concealing the fact of indebtedness and the existence of a bill of sale or mortgage to secure it, to enable the debtor to obtain on credit money or property from third persons, may be estopped from asserting his lien or claim when necessary to protect innocent third persons from being defrauded of debts due them, created in the belief that no indebtedness to the party sought to be estopped existed; and such estoppel extends to an assignee of such party for benefit of creditors, he not being an innocent purchaser for value, and is not obviated by his securing a new bill of sale, no consideration therefor being satisfactorily shown.

This was a suit by Bacon and others against A. W. Harris and others, to set aside certain bills of sale as being void against creditors.   Submitted on pleadings and proofs.

Park & Odell, for complainants.

O. J. Clark and Swan, Lawerence & Swan, for defendants.

SHIRAS, District Judge.   The facts in this case, as gathered from the evidence, appear to be as follows: At and previous to the year 1886, A. W. Harris was engaged in the business of buying and shipping grain at Manley, Iowa, and subsequently at Sibley and other points in northwestern Iowa.   In 1886 he associated with himself a partner named Kunsdon, and the business was conducted under the firm name of Harris, Kunsdon & Co. until in April, 1889, when Harris bought out the interest of Kunsdon in the firm, and in the same month he admitted as partners J. W. Orde and R. A. Harbord, who were then the cashier and president of the Sibley Exchange Bank, the business being done under the firm name of A. W. Harris & Co. until the spring of 1891, when said Orde and Harbord withdrew from the firm, the business thereafter being conducted by A. W. Harris, under the name of A. W. Harris & Co., until April 6, 1893, when he failed and suspended business, having at the time elevators or warehouses at Sibley, Archer Grove, and Ocheyedan, in Iowa.   During this time, the complainants, who were commission merchants, residing at Milwaukee, Wis., had from time to time advanced money to said Harris and his partners to be used by them in the purchase of grain; and on the 6th day of April, 1893, when Harris finally suspended,

there was due to complainants from him the sum of $2,617.87, for which amount Harris confessed judgment in favor of complainants in the district court of Osceola county, Iowa, under date of May 12, 1893, in accordance with the provisions of the Code of Iowa, and, judgment having been duly entered up, execution thereon was issued to the sheriff of Osceola county, and by him returned unsatisfied. It further appears that the Sibley Exchange Bank was merged into the Northwestern State Bank of Sibley at some time prior to April, 1891, the exact date not appearing in the evidence; and on the 6th day of April, 1893, said bank suspended payment, and made an assignment of its property to H. E. Thayer. On the 11th day of April, 1893, the attorney general of the state of Iowa filed a petition in the name of the state, against said bank, in the district court of Osceola county, asking the appointment of a receiver to take charge of the property of the bank, and wind up its affairs; and on the 18th day of April an order was entered appointing H. E. Thayer a receiver, and authorizing him to take possession of the assets of said bank. It further appears that, about the time J. W. Orde and R. A. Harbord withdrew from the firm of A. W. Harris & Co.,—that is to say, in the month of April, 1891,—A. W. Harris executed and delivered to the Northwestern State Bank of Sibley a bill of sale, in the nature of a mortgage, for the sum of $25,000, conveying the steam elevator, appurtenances, furniture, coal house, etc., owned by said Harris at Sibley, Iowa; also the grain warehouse and appurtenances at Sibley; also elevator, appurtenances and coal house at Ocheyedan; also one-half interest in warehouse at Harris; also warehouse and appurtenances at Archer Grove, Iowa. This mortgage or bill of sale was not filed for record by the bank until the time when the bank suspended payment, in April, 1893, when it was recorded. The property remained in the possession and under the control of A. W. Harris until April 7, 1893. On that day H. E. Thayer procured the execution by A. W. Harris of two bills of sale, covering the elevators, warehouses, fixtures, furniture, and grain owned by said Harris and located at Sibley, Ocheyedan, and Archer Grove, it being the intent to cover by said bills all the property of said Harris at these places, the same constituting practically all the assets then owned by him. Thayer testifies that when he procured the execution of these bills of sale, he had no knowledge of the existence of the bill of sale previously executed to the bank, of which he was assignee. After the appointment of Thayer as receiver, he sold the greater portion of the property covered by the bills of sale executed by Harris, and reported the same to the district court of Osceola county, by which court the sales thus made were approved. On the 16th day of May, 1893, the complainants filed the bill in the present case, whereby they seek to set aside the bill of sale executed to Thayer, assignee, by A. W. Harris, on the ground that the Northwestern State Bank is estopped from asserting the existence of any indebtedness to it from Harris, as against complainants; that the said bank actively aided A. W. Harris in obtaining credit with complainants, and the advancement of moneys

from time to time, by concealing the fact of the existence of the indebtedness to the bank, and the giving of a mortgage to secure the same.

The first question presented by the answer of Thayer, receiver, is as to the jurisdiction of the court, it being averred that the state court, having jurisdiction of the receiver and the property in his hands, has exclusive jurisdiction over all questions connected with the settlement of the affairs of the insolvent bank. It will be borne in mind that the real question at issue is between two creditors of A. W. Harris, as to their rights and equities in his assets. The state court has not jurisdiction over his estate, as he has not made an assignment, nor has a receiver of his property been appointed. The ultimate question of issue is whether the bills of sale of the property of A. W. Harris executed to Thayer, as assignee of the Northwestern State Bank, are valid or invalid as against the claim and judgment of the complainants. The appointment of a receiver by the state court of the property of the bank did not confer upon that court jurisdiction over the estate or property of A. W. Harris. When the bill in this case was filed, the property covered by the bills of sale had not been sold or converted into money, and the purpose of the bill was to obtain a decree adjudging these conveyances to be void as against the debt due complainants, and thus enabling complainants to secure a levy of execution upon the property. If the property had not been sold, no reason exists why this court could not have proceeded to determine the question of the validity of the bills of sale executed by Harris, and the fact that the receiver has seen fit to sell the property during the pendency of this suit does not defeat the preexisting jurisdiction. Even if it be true that the possession of the property, or the money which now represents it, is with the state court, that does not defeat the jurisdiction of this court over the respective equities and rights of the complainants and the bank, although it may affect the nature and extent of the remedy which can be granted.

Objection to the jurisdiction of this court is further made upon the grounds that the courts of the United States, sitting in equity, cannot give aid to the enforcement of judgments at law rendered in a state court. In Taylor v. Bowker, 111 U. S. 110, 4 Sup. Ct. 397, a bill was filed in the United States circuit court for the district of Maine, for the purpose of enforcing the collection of a judgment rendered in a court of the state of Maine; and the relief prayed for was granted. In Tube-Works Co. v. Ballou, 146 U. S. 517, 13 Sup. Ct. 165, it is said:

"Where it is sought by equitable process to reach equitable interests of a debtor, the bill, unless otherwise provided by statute, must set forth a judgment in the jurisdiction where the suit in equity is brought, the issuing of an execution thereon, and its return unsatisfied, or must make allegations showing that it is impossible to obtain such a judgment in any court within such jurisdiction."

The decision in that case was that a judgment in the state of Connecticut would not support the proceedings in equity in the

state of New York, but, if I correctly interpret the ruling, it is to the effect that a judgment at law in any court, state or federal, in the jurisdiction in which the proceeding in equity is brought in the federal court, will meet the requirements of the rule that a party must exhaust his remedy at law before he can invoke the aid of a court of equity. The main reasons underlying the proposition that in the courts of the United States a bill in equity will not be sustained in favor of one who is only a general creditor, and whose claim is unliquidated, are twofold: First, because the fact of the existence of a just claim in favor of the creditor must be established by a judgment at law, or otherwise the debtor is deprived of his constitutional right to a trial by jury; and, second, because it must appear that the creditor cannot collect his claim at law before he can invoke the aid of a court of equity, which is not primarily a court for the collection of debts. It is the latter reason that requires the obtaining a judgment in the jurisdiction wherein the aid of a court of equity is invoked as a prerequisite thereto. A judgment rendered in any court of competent jurisdiction would be sufficient evidence of the existence and amount of the claim; but the rendition of a judgment in one state, and a return of execution unsatisfied, would only show that the judgment debtor did not have property in that state, and would not be evidence that he might not have property open to levy in other states. For illustration, a judgment rendered in the state of Nebraska, and a return of execution unsatisfied, is evidence showing the judgment at law cannot be collected in that state, but it is not evidence that the debtor has not ample property in the state of Iowa which may be reached by execution. Hence the need for obtaining judgment within the jurisdiction wherein the aid of the court of equity is invoked, and, by return of execution unsatisfied, proving the need of equitable aid. This proof, however, may be furnished as well by means of a judgment in the state court as by a judgment in the federal court, for the process by execution is as effective in the one court as in the other; and therefore, if a party has obtained judgment in a state court, and has issued execution, without being able to enforce payment thereof, he is entitled, upon return of the execution unsatisfied, to invoke the aid of a court of equity, either state or federal, sitting in the same state, of otherwise competent jurisdiction, for the enforcement of his rights; and therefore, if the amount involved is sufficient, and the citizenship of the adversary parties is diverse, he may file a bill in a court of the United States for the purpose of attacking conveyances of property which prevent the levy of an execution in the law action. I therefore hold that this court has jurisdiction in the present proceeding, and the question for determination is whether the complainants are entitled to estop the Northwestern Bank and its receiver from asserting the validity of their claim to the assets of Harris, which were described in the bills of sale executed under date of April 7, 1893.

According to the general principles that sustain the doctrine of estoppel by conduct, it seems clear that a creditor who unites with his debtor in concealing the fact of the indebtedness to him, and of

the existence of a mortgage or bill of sale to secure the same, this being done to give the debtor a credit which he could not have if the truth were known, and to enable the debtor to obtain on credit money or property from third parties, may be estopped from asserting his claim or lien, when such estoppel is necessary to protect innocent third parties from being defrauded out of the collection of the debts due them, and which were created in the belief that no lien or indebtedness existed in favor of the party sought to be estopped.

In Blennerhassett v. Sherman, 105 U. S. 100, it was held by the supreme court that:

"Where a mortgagee, knowing that his mortgagor is insolvent, for the purpose of giving him a fictitious credit, actively conceals the mortgage which covers his entire estate and withholds it from the record, and, while so concealing it, represents the mortgagor as having a large estate and unlimited credit, and by these means others are induced to give him credit, and he fails, and is unable to pay the debts thus contracted, the mortgage will be declared fraudulent and void at common law, whether the motive of the mortgagee be gain to himself or advantage to his mortgagor."

In the course of the opinion, the supreme court cited approvingly the following cases, to wit:

Hungerford v. Earle, 2 Vern. 261, wherein it was held that:

"A deed not at first fraudulent may afterwards become so by being concealed or not pursued, by which means creditors are drawn in to lend their money."

Also Coates v. Gerlash, 44 Pa. St. 43, wherein it is said:

"There is another aspect of the case, not at all favorable to the wife. It is that she withheld the deed of her husband from record until December 2, 1857. In asking that a deed void at law should be sustained in equity, she is met with the fact that she asserted no right under it, in fact concealed its existence, until after her husband had contracted the debts against which she now seeks to set it up. There appears to have been no abandonment of possession by her husband. Even if the deed was delivered on the day of its date, the supineness of the wife gave to the husband a false credit, and equity will not aid her at the expense of those who have been misled by her laches."

Also Hilliard v. Cagle, 46 Miss. 309, wherein the principal circumstance relied on to avoid a deed of trust was the fact that the grantor retained possession of the property, and the deed was withheld from record, and the mortgagor was enabled to contract debts upon the presumption that the property was unincumbered, the court declaring:

"That the natural and logical effect of the agreement and assignment, and the conduct of the parties thereto, was to mislead and deceive the public, and induce credit to be given to the mortgagor which he could not have obtained if the truth had been known; and therefore the whole scheme was fraudulent as to subsequent creditors, as much so as if it had been contrived from that motive and for that object."

Also Gill v. Griffith, 2 Md. Ch. 270, wherein it was held that a party cannot be permitted to take a bill of sale or mortgage of chattels from another for his own security, leave the mortgagor in possession and ostensibly the owner, and at his request, and to keep the public from a knowledge of its existence, withhold it from the record an indefinite period, renewing it periodically, and then re-

ceive the benefit of it by placing the last renewal upon record, to the prejudice of others whom the possession of that very property by the mortgagor has induced to confide in him.

Also Hafner v. Irwin, 1 Ired. 490, wherein a deed of trust was withheld from record, and was therefore held void as against creditors.

Also Neslin v. Wells, 104 U. S. 428, wherein a mortgage was given to secure part of the purchase money, and it was held that the failure to record the same "constituted such negligence and laches as in equity requires that the loss which in consequence thereof must fall on one of the two shall be borne by him through whose fault it was occasioned."

This question has been recently considered by the supreme court of Iowa, in the case of Goll & Frank Co. v. Miller, 54 N. W. 443, wherein the facts are very similar to those in the case at bar. It therein appeared that one Miller had at different times executed chattel mortgages upon his stock in trade to J. L. Nicodemus. These mortgages were not recorded. On the 16th day of June, 1890, Miller executed a bill of sale of his stock to Nicodemus, who took possession of the property. Subsequently, other creditors filed a bill in equity, averring that they were entitled to priority over Nicodemus, by reason of the fact that he had withheld the previous mortgages from record, thereby misleading them into giving credit to Miller. After stating the facts, the court said:

"It is charged that the withholding of the mortgages from record was a fraud as to the plaintiffs, and this is the principal question in the case. There can be no doubt that the withholding of the mortgages from record, in pursuance of an agreement between the parties, could have but one object, and that was to maintain the credit of Miller, and lead parties with whom he dealt to give credit to him, in the belief that he was not a chattel-mortgage merchant. In such a case it is well settled that the mortgagee cannot be permitted to insist on the validity of his mortgage, as against those who have given credit to the mortgagor under such circumstances. Such a transaction is fraudulent as to the other creditors. * * * There are several grounds upon which it is claimed by counsel for the defendant that the rule above announced should not be applied to this case. The principal contention turns upon the alleged fact that the taking of the bill of sale on the 16th day of June was an entirely new transaction; that the debt to Nicodemus was an honest obligation; and that, being a bona fide creditor, he had a right to secure his claim, even if it resulted in the bankruptcy of Miller. This is true if the bill of sale was the only act of Nicodemus which prevented the plaintiffs from securing their claims. But the bills of sale could not purge the several mortgages of their fraudulent character. The mischief was done by withholding the mortgages from the record. It is fair to presume that, if the mortgages had been placed on record, the plaintiffs would not have been creditors of Miller."

The conclusion reached was that, upon the facts of the case, it must be held that the bill of sale was void as against creditors who had been misled by the failure to record the pre-existing chattel mortgages.

The principles thus announced by the supreme court of Iowa and the supreme court of the United States are decisive of the case now before the court. The evidence shows that J. W. Orde and R. A. Harbord, who were the president and cashier of the

private bank known as the Exchange Bank of Sibley, became partners in the grain business carried on under the name of A. W. Harris & Co. The Exchange Bank was merged into the Northwestern State Bank, J. W. Orde being president and R. A. Harbord cashier thereof. In April, 1891, a bill of sale, in the nature of a chattel mortgage, was executed and delivered to the Northwestern State Bank, which covered substantially all the partnership property. The mortgage was not recorded until April 6, 1893. The reason why it was so withheld from record could have been no other than the one given by Harris in his statement to the agent of complainants, in which he stated that it was withheld from the record because it would hurt his credit if it was filed, and the bank assented to his request not to record it. Having thus aided Harris in obtaining a false credit from complainants and others, the bank cannot now be permitted to assert that it has a debt and lien superior in equity to the claims of those whom it aided in defrauding. It needs no elaboration of the facts to show that the bank is estopped from asserting any rights as against complainants, under the bill of sale executed in April, 1891. It is, however, claimed that the bills of sale executed to Thayer, assignee, in April, 1893, have no relation to the bill of sale withheld from the record, and the invalidity of the latter cannot affect the former; that when Thayer, as assignee, procured the execution of the bills of sale to himself, he had no knowledge of the existence of the first bill of sale; and that, as assignee, he had the right to take the bills in payment of the indebtedness actually due the bank of which he was assignee. Thayer, as assignee of the bank, was not an innocent purchaser for value. He succeeded to the rights of the assignor, but took its property subject to all rights and equities in favor of third parties. If the complainants had the right to estop the bank from asserting a superior claim to the assets of A. W. Harris, the same right existed as against the assignee of the bank. Therefore the question is just as it would have been had the bank, previous to its assignment, taken the bills of sale now relied on under the circumstances shown in the evidence. The wrong and fraud committed against third parties by withholding knowledge of the existence of the chattel mortgage and the debt secured thereby is not obviated by the mere device of securing a new mortgage or bill of sale, as is well shown in the opinion of the supreme court of Iowa in Goll & Frank Co. v. Miller, supra. The inequity chargeable against the bank is that it aided the debtor in concealing his real condition, and in obtaining a false credit, thereby misleading others, and inducing them to extend a credit which would not have been given had the truth not been concealed. The loss resulting from this conduct must fall upon one of the parties, and equity requires that it shall be visited upon the one whose misconduct has caused the loss.

The evidence shows without dispute that A. W. Harris is justly indebted to complainants in the sum of $2,617.87, and interest, for advances made him in aid of his business. This debt has been reduced to judgment, and complainants are therefore entitled to subject the property of the judgment debtor to levy of process for

the collection of the judgment. The property of the debtor Harris was found in the possession of H. E. Thayer, who claimed the right thereto as the assignee of the Northwestern State Bank, under the bills of sale executed to him as assignee by A. W. Harris. To substantiate the claim that Thayer stands as an innocent purchaser under the bills of sale to him, it would be necessary to prove that he had paid value for the property. There is nothing in the evidence to show that Thayer personally paid anything therefor, and there is nothing to show that Harris was in fact indebted to the bank. The bills of sale to Thayer, as assignee, recite the payment in the one of $1,500, and the other of $10,000, as a consideration for their execution; but these recitals are not evidence as against the complainants. Sillyman v. King, 36 Iowa, 207; Boone v. Chiles, 10 Pet. 177. There is nothing to show, and it is not claimed, that Thayer paid any consideration to Harris when the bills of sale were executed to him, and the only consideration therefor must be found in the existence of an indebtedness from Harris to the bank, and this is not proven by competent evidence. The witnesses assume the existence of the fact, but none testify thereto, and there is really no evidence from which it can be determined that there was an indebtedness for any given sum from Harris to the bank at the date when the bills of sale were executed to Thayer, as assignee of the bank. Under these circumstances, it must be held that the bills of sale executed by A. W. Harris to H. E. Thayer, as assignee of the Northwestern State Bank, under date of April 7, 1893, are invalid as against the complainants, and that the property taken possession of by said assignee, and described in said bills of sale, was liable to be levied on and sold in satisfaction of the judgment in favor of complainants, against A. W. Harris, entered in the district court of Osceola county, Iowa; that, the said property having been sold and converted into money by said Thayer, after the bringing of this suit, the money in his hands stands in equity in place of the property, and so much thereof as is necessary is properly applicable to the payment of said judgment, interest thereon, and the costs of these proceedings, and the complainants are entitled to a decree accordingly. As it has been urged in argument that a decree of this court would be ineffectual, because the money realized from the sale of the property of A. W. Harris has passed into the possession of the state court in the proceedings against the Northwestern State Bank, it may not be out of place to suggest that, if the money in fact has been paid into or placed under the control of that court, then the complainants herein should apply to that court for an order directing that so much of the money realized from the sale of the property of A. W. Harris as is needed to pay off the judgment, interest, and costs in favor of complainants be so applied, the motion being based upon the decree in this case; and thus the rights of the parties will be protected without conflict between the different courts.